### WELLS v. UNITED STATES FIDELITY & GUARANTY CO. et al.

No. 28035.    March 22, 1938.

Spiers & Bodovitz adn Bohanon & Adams, for plaintiff in error.

Owen & Bullis, for defendants in error.

BAYLESS, V. C. J.  Leo Sanders filed an action in the district court of Oklahoma county, and in the petition filed therein he alleged that through the efforts of O. A. Wells, an insurance broker, he procured United States Fidelity & Guaranty Company, a corporation engaged in the business of writing surety bonds, to execute for him a surety bond, and that he was indebted thereon for the premium in the sum of $23,399.47; that said company was entitled to a portion of said premium, and certain persons claiming to be brokers, or agents of the company, were entitled to portions thereof, the exact amount of which was unknown to him, and he could not pay said sum to any one except at his peril; and he tendered said money into court to abide the judgment of the court as to who was entitled thereto. He named as defendants the company, O. A. Wells, and Ancel Earp, transacting business as Ancel Earp & Company.

Wells filed an answer and cross-petition in which he alleged that as an independent broker of bonds he procured this business for United States Fidelity & Guaranty Company, and under an agreement and the usual custom of business with such com-

pany, he was entitled to a broker's commission of $4,679.89. The other defendants denied this.

United States Fidelity & Guaranty Company filed an answer and cross-petition in which it admitted executing such bond as surety for Sanders, but alleged that Wells was not its broker, or agent, and was not entitled to any portion of the premium, but, on the contrary, Ancel Earp & Company was entitled to the entire commission. It does not appear that Wells pleaded further to this.

Ancel Earp filed an answer and cross-petition in which he denied the allegations of agency on the part of Wells, and adopted all of the allegations of the answer and cross-petition of United States Fidelity & Guaranty Company.

The cause was tried to the trial judge, without a jury, and at the conclusion of the evidence the trial judge rendered judgment for United States Fidelity & Guaranty Company for the entire sum, with the finding that Earp was entitled to the entire commission, and that Wells was not entitled to any part of the commission. There was positive evidence in the record from which he could have found that either Wells or Earp was the moving, procuring cause. Each man had evidence to sustain his claim. Of this conflicting evidence, the trial court believed Earp's. The costs of the action were taxed to Sanders, and he does not appeal. Wells appeals.

Wells divides his argument into two parts, and subdivides the second part. The first proposition is:

"The court committed error in casting the burden of proof on the plaintiff in error, who was one of the defendants and claimants in the cause below."

When Sanders had completed his testimony touching upon his reason for seeking the assistance of the court in determining who was entitled to the money, there ensued argument as to who bore the burden of going forward with the proof. That argument is not set out in the record, but at its conclusion the trial judge said, in addressing attorneys for Wells:

"In view of the written contract in evidence here, and in view of the fact that your client, Mr. Wells, does not claim to be the agent of the United States Fidelity & Guaranty Company, I think the burden would be on you, to start with anyway."

We believe Wells has misconceived the purpose of the ruling. We are of the opinion that the trial court merely ruled that the burden was upon Wells to first introduce evidence. Thereafter, all other defendants introduced evidence. Upon all of the evidence the trial court determined who, in his opinion, was entitled to the commission. We do not believe his judgment can be construed to be that Wells failed to sustain the burden of proof in the first instance. We believe that he merely decided upon the order of the introduction of evidence, and when all of the evidence was in, treated Wells and Earp as standing upon equal footing as claimants, but decided that Earp had shown a better claim to the commission than had Wells. At this point we call attention to the fact that no one disputes that United States Fidelity & Guaranty Company was entitled to the net premium. Its net premium was the same irrespective of who divided the commission. In so far as this is concerned, it is admitted by Wells that he was entitled to only 20 per cent., and Earp to 5 per cent.

We now consider the second proposition, subdivision A, which reads:

"The court committed error in not rendering judgment for the plaintiff in error, Wells. (a) From the testimony of the various witnesses as shown in the abstract of record."

For argument, Wells likens his functions in this matter, and his legal position, to that of a real estate broker. He argues that he was the moving or procuring cause. We agree with the analogy presented, but disagree as to the legal effect of his proof in the light of the trial court's judgment. Wells and Sanders both testify that the first conversations relating to procuring a bond through United States Fidelity & Guaranty Company were between them. However, Wells was not an agent of United States Fidelity & Guaranty Company, and these conversations would not be binding upon it until their agreement was ratified. Wells and Sanders both testify that Wells inclined Sanders to accept a bond executed by United States Fidelity & Guaranty Company, but this likewise would not be binding upon United States Fidelity & Guaranty Company until it ratified said agreement. Wells testifies that he did bring this to its attention by taking the matter up with Mr. Williams, manager of United States Fidelity & Guaranty Company's Oklahoma City office. He testified that he asked Williams if the company would write the business,

and procured a blank form of application from Williams for Sanders, and later made many helpful suggestions and furnished Williams an informal statement of Sanders' financial status. Williams denies his testimony in this respect. He testified positively that the first he knew of Wells in this deal was a statement made to him by Earp when Earp returned from Baltimore, where he had been seeking the company's consent to execute the bond. This statement was that Sanders had solicited Earp to take care of Wells out of the commission, and that Earp had agreed to pay him $250. Wells places stress upon the fact that the application upon which the bond was actually issued is the application prepared for Sanders by him. He testified that he got this blank from Williams' office, but does not say that he told them who the particular blank was for. Further, when he had prepared the application and Sanders had signed it, Sanders put it in his desk drawer, and no one connected with the transaction saw it again or paid any attention to it until the delivery of the executed bond. It is clear that the written application for the bond and the executed bond were delivered simultaneously. Sanders explained this thus: Among the questions he was required to answer was whether he had applied for a bond for this contract and had been refused. If he answered the question in the affirmative, it lessened his chances of getting another company to execute a bond for him. Therefore, it was customary to carry on all negotiations for these bonds orally and to delay the delivery of the written application until the bond was delivered. This deprives Wells' argument in this respect of much of its validity. Sanders' testimony discloses that the preparation of this application was a matter wholly between him and Wells, and that in so far as the others connected with the transaction are concerned, they never knew of this application or treated Wells' preparation of it as a part of the moving or procuring cause. Wells' name does not appear on the application. This is all of the evidence on this point. It can be seen that Wells' and Williams' evidence is in direct conflict. The effect of the judgment of the trial court on this conflicting evidence was to find that Wells was not the moving or procuring cause. It requires no citation of authority for the proposition that we cannot inter-fere with the judgment of a trial court in a law action, based upon conflicting evidence.

The subdivision (b) of this second proposition is that the court committed error in not rendering judgment for Wells, "from the admissions of the defendant Ancel Earp." Wells sets out in several pages of his brief the examination of Earp concerning when he first heard of Wells' connection with the transaction, his reaction thereto, and motive therefor. Earp testified that the first time he knew of Wells in this matter was when he and Sanders were in Baltimore endeavoring to gain the consent of the United States Fidelity & Guaranty Company to execute the bonds. He said Sanders told him that he (Sanders) wanted him (Earp) to take care of Wells for a small amount of the commission, and said further that he had refrained from mentioning Wells' name to Earp theretofore. He told Earp he wanted Wells to have this money as a compensation for little services which Wells had rendered Sanders in connection with the preparation of his financial statement, and suggested that $250 or $300 was sufficient. Earp testified he agreed with Sanders to pay Wells $250 and was still willing to pay Wells that sum of money. When questioned as to why he thought Wells was to get this money, he said he supposed it was because Sanders felt under obligation to Wells. (Earp testified positively that he did not agree to pay Wells $250 as a broker or in consideration of Wells' services in procuring business.)

We find nothing in this testimony of Earp's which can be construed as an admission favorable to Wells, or that in any wise implies that Earp considered Wells in the position of a broker producing this business. To construe these statements to be admissions in favor of Wells requires us to not only disbelieve Earp's statements but to carry this disbelief into an implication to the contrary. It might be proper to disbelieve the positive statements of a witness, that is, not to accord those statements the weight of evidence, but we know of no justification for translating a witness' unequivocal affirmative statement into an opposite negative.

Judgment affirmed.

PHELPS, CORN, GIBSON, and HURST, JJ., concur.